Thank you, Your Honor. Good afternoon. May it please the Court, Counsel, and I would like to reserve three minutes for rebuttal. Keep your eye on the clock there. Your Honors, this case is about 30 years of prejudice that my client suffered in the form of 30 years of incarceration due to his trial attorney's incompetent cross-examination of a police officer. Through that cross-examination, my client's trial counsel negated a positive identification of the co-defendant as the trigger man of the machine gun. This was the best possible witness this could have come from. It was the only other eyewitness to the shooting, and in fact, the trained police officer who had been shot at. Well, there's a – let's assume for the sake of your argument that you convince us, under the first prong of Strickland, that there was a breach of the obligation that defense counsel owed his client in that respect. How do you get past the prejudice prong? Judge Holland made mention of the fact that this case had enough evidence to convince him beyond a reasonable doubt, as much as any prosecutor could ever hope for in a case. That's a fairly significant comment, and in looking at the record, I tend to agree with it. And so even if the lawyer was ineffective in the manner in which you cross-examined the Anchorage officer, how do you get over the prejudice prong? Well, Your Honor, a few things. First of all, I would respectfully disagree with that statement that Judge Holland made, although when I saw it, I knew that was going to be a ground for contempt. You'd hear it again. I would hear it again. But most importantly, Your Honor, I think I would point out that we're talking about separate counts here. And certainly, the evidence that Mr. Pierce was involved was stronger than the evidence that Mr. Pierce was the trigger man. And that's where the 30 years came in. There's a 30-year mandatory minimum consecutive sentence. That's resulting from the evidence. There's pretty strong evidence that that Beretta machine rifle was his, that he had it. He had it with him when he left the final crash. He had the material. It's all traced to him. It must have been his rifle. Isn't it overwhelming? Well, Your Honor, the rifle, and we're talking about the Norinco, there were two firearms involved. I'm talking about the repeat. The Norinco was recovered from the second vehicle, from the Bronco. Now, and there were certainly parts discovered that were linked up to that gun, and those were discovered in Mr. Pierce's home. Although I don't, the record would reflect that that did not link it to Mr. Pierce exclusively. There was another co-defendant, Douglas Franklin, who also had access to that home, who also had He wasn't in the car, though. He wasn't shooting it. Mr. Franklin, the government's theory was that he was not involved on the day of the robbery. But in terms of the linkage to the machine gun itself, in terms of what was discovered in the bedroom, that bedroom was just as much, could just as easily have been linked to Mr. Franklin as Mr. Pierce. But the problem with your argument, viewing the evidence as we must, and the light most favorable to the jury's verdict, since Franklin wasn't there on the day, there were only two and we eliminate Franklin, then don't we have to draw the inference that the evidence that was found in Mr. Pierce's bedroom, which linked him to the Norinco, links him to the Norinco on the date of the robbery? The evidence would support that he's linked to the Norinco. Our position is that he, the evidence was insufficient had his counsel not negated that, had his counsel not negated the positive identification of Hubbard as the shooter. But the problem, again, with the evidence is we've got testimony by other Anchorage officers, as I recall, that your client leaped out of the van after it crashed into the fence and that there were fingerprints that were found in the rear portion of the van from which the shooter would have necessarily had to have been firing. If I draw the inference from the agent's testimony that the Norinco would be a very difficult automatic weapon to fire one-handed, so that assumes that the shooter was using both hands in order to control the machine gun while he was firing it. Well, Your Honor, I'm not sure that we can assume that. What Officer Schemm, Robert Schemm testified to was that the Norinco could have been fired with one hand, albeit wildly. And what we have here is a situation where an officer testified that he saw Hubbard. He thought Hubbard was the one that fired the weapon at him. Now, yes, he was the driver. But your theory would have to be that the driver, what, opened the door and leaned out, holding the wheel with one hand and the automatic weapon in the other? The testimony that came in was the rear windows of the van were actually shot out. Shot out. He would have had to have turned around and fire that with one hand in order to do that. Now, although Mr. Butler thought he heard testimony that said the bullets actually hit the hood of the car, that wasn't the case. No bullets ever hit anything. So, in fact, the machine gun was fired wildly. If it had been a person in the back of that van firing it with two hands, it would have been much more likely that the bullets would have hit someone. But can we get this for a second back to your, what is, I gather, the entire thrust of your argument. Why, what specifically did the lawyer do that would not be overcome by the overwhelming evidence that you think overturns what the jury did? Well, Your Honor, this is, I think, a rare case in that it's an ineffective assistance case where we can show the court, we don't have to speculate what the evidence would have been, had his attorney acted as he should. Okay. Specifically, what are you referring to? What he would have had, had he not negated Officer Reeder's identification of Harper as the shooter. You're just now referring to the question. You didn't really know who it was. You didn't identify for sure who that was. That one question. I'm sorry? Who was shooting. Butler's question to the officer that testified. That one question to ask him was, you can't say that you've identified who that person was. That's, your only ineffectiveness was right there, isn't it? For this particular claim. Now, we have a myriad of claims in this case, but what we have here. Well, talk about the machine gun because you're not going to get very far, I don't think, on any of the others. Fair enough. The, what we have here is Officer Reeder, before he says he doesn't know who he is, he has the gun. He's got it in his hands. He's got a knife. He's got a gun. He's    Now, if you look at Page 33. It's pages 31 to 32. He's asked specifically if the person who saw, if the person he saw firing the machine gun had a goatee. And the answer was that is correct. And later, he's asked in terms of people. He saw the one of the vehicle with a faded car, hard jacket. Answer is that is correct. And there's testimony that said to the effect, you thought that was the person that was shooting at you. Answer, yes, that's correct. Now, he had a positive identification right there of the co-defendant as a shooter. For some reason that we can't explain, he pushed Officer Reeder on that identification with his last question and said, isn't it true that you didn't really know who shot at you? And the answer was, that's the one question you charged him with an ineffective Yes. Because had he not asked that final question, had he not elicited that final answer, the jury would have been left with testimony from a trained police officer, the officer who was actually shot at, saying the person who fired this gun at me was the co-defendant. And the jury would be given the wrong impression of what the witness actually saw. Well, Your Honor, that game better not to let the jury know how much they need to know. The jury is tasked with ruling based on the evidence that's before them. Kimmelman v. Morrison talks about the right to infectious disease. And the more you can keep in the dark, if you can win, the better. I'm sorry? The more you can keep the jury in the dark, if the full evidence would hurt you in order to win, that's what the law is supposed to do. Well, Your Honor, trial tactics are trial tactics. Certainly, at times, part of the defense is trying to keep certain evidence away from a jury. And the rights to effective assistance of counsel fall on everyone, innocent and guilty alike. Had he not negated that identification, the only other person that would have testified to the identity of the defendant would have been fingered by that officer as the actual shooter, who was a co-conspirator, who was a cooperating witness, doing what he needed to, to curry favor with the government. I'm back to the questions I was asking you before. You can't look at this in isolation. We've got to look at it with all the evidence that the jury had before it, linking your client to the gun. And that, I think, is what Judge Holland was referring to when he was talking about the overwhelming evidence. And, Your Honor, the government's theory was not that Mr. Pierce was linked to the gun. The government's theory, as it argued in its opening, as it argued throughout the case, and as it argued in its closing, was that Mr. Pierce was the shooter of that rifle. Well, yeah, but the government pointed out, I think, that in the search of his home, that pieces that had the same serial number were found. That's correct. So I'm not sure I understand what you just said. Well, that doesn't make him the shooter, the fact that pieces are found in his home. Right. Even if he had admitted that those pieces were his. It suggests to the jury that he was the owner of the weapon. Then the next question they have to decide is, was he also the shooter? Right. And if Officer Reeder's testimony had stood, that said Hubbard was the shooter, I don't believe the jury would have made that finding. It's certainly sufficient to undermine confidence in the outcome. Well, but, again, we've got more evidence, don't we? Putting him in the back of the van, the fingerprints that were found on the plastic bag. Mr. Pierce's, there was a palm print found on a bag that was in the back of the van. Right. But, again, he was chased from the van and captured in the woods shortly. He was discovered in the woods nearby the Bronco shortly after the chase, but nobody was able to identify him. The perpetrator was dressed in all black and had a helmet on and masks. And dark clothing. And dark clothing. And he had, was it a holster? Was that where the browning comes in? Well, there was a beretta that I believe was discovered in the van. Right. And he had the holster, right? I don't believe he had the holster on him. He was dressed in black clothing. He didn't have a mask. There were other items discovered nearby. He was identified as holding the repeating rifle. He was identified by the co-conspirator as holding the rifle. I thought an officer saw him with the rifle when he left the car that was wrecked. But that officer couldn't identify Mr. Pierce specifically. And there was some testimony that also came in from Mr. Hubbard that's cited in our brief, and I can draw the Court's attention to it, that indicated that he was equivocal at trial about even the number of people that were in that van. He was asked how many people were in the van and how many people were in the Bronco and if it was just two, and he kept saying, I don't know, two, I think. He was equivocal about it. Mr. McHenry, did you want to reserve your irony minutes?  Mr. Collins. Thank you, Your Honor. Stephen Collins for the U.S. Attorney's Office in Anchorage. Before I begin, for some inexplicable reason, as my colleague pointed out, the supplemental excerpt of record paginations of the excerpt submitted don't jive with that in the brief citations. However, the facts cited in my brief are in the supplemental excerpt of record. The pages directly cited, however, don't seem to match. For instance, Mr. Pierce asserted that the government leaves a false impression that he was found with a ski mask, a holster, and other equipment. However, on pages 207 through 216, the testimony of Agent Henderson at the trial specifically identified Mr. Pierce as having been found with the ski mask, the military boots, the flight gloves, as well as the gun holster that matched or read a pistol found in the back of the van. So the record in the case, as well as the supplemental excerpt, supports the facts that we submitted in our brief. To set this back into... Am I wrong in thinking that the defendant, Pierce, was identified as having the rifle in his possession when he left the final car? You are not wrong. And the events that occurred on that day, back in 2000, were such that as Mr. Pierce was in the bank robbing the credit union, I'm sorry, the credit union, two employees identified the robber as being completely dressed from head to toe, in black, and carrying a hand pistol. Police officers immediately surrounded the credit union. There they saw the van, the getaway van, and there were two vehicles involved in this planned robbery. They saw the van and they saw the driver, clean-faced, however he had a Fu Manchu mustache. He wasn't wearing any ski masks. And he was identified as wearing brown clothing. The tellers identified the robber inside, who grabbed the bag of money, was dressed completely in black. Police officers surrounded the credit union, at which point Mr. Pierce got into the back of the van. Mr. Hubbard, who was dressed in brown, drove away at a high rate of speed. Officer Reeder was one of the police officers who pursued Mr. Pierce and Mr. Hubbard. They drove behind a series of box stores at a high rate of speed, recklessly. And as the previous panel of this court found, the evidence was such that the jury could infer that it was Mr. Pierce who fired the machine gun because of the way in which that van took off. There was no conceivable way that a person, by necessity, could hold onto the wheel with both hands and fire a machine gun, which necessitated to be at least in control with two hands. Therefore, the inference of the jury drew that the person in the back of the van, Mr. Pierce, was the one who shot it. Get to my question. After they finally got to the switch-out spot, Officer Reeder, who pulled off because of the machine gun, saw, left the vehicle, but another police officer pulled right in. Officer Marino saw Mr. Pierce, dressed completely in black, leave the van carrying the Norinco. Mr. Hubbard, dressed in brown, also approached a Bronco. They both kind of collided by the driver's side. They had a difficulty getting into the Bronco. But finally, Mr. Pierce, dressed in black with the ski mask, got behind the wheel. Mr. Hubbard went around and got into the Bronco, and they drove off. The second vehicle, that's the vehicle that crashed into the fence. As the vehicle, as the Bronco was driving away from the switch-out spot, Officer Marino, who had seen the man in black carrying the Norinco, saw the driver was wearing a ski mask. Officer Henderson testified that Mr. Pierce was the one who had the ski mask. When the Bronco finally crashed through the fence, there were only two bodies that came out of that car. Mr. Pierce and Mr. Hubbard. And those were seen by police officers who followed both Mr. Pierce and Mr. Hubbard as they split off. Mr. Pierce shedding items that he had with him as well as Mr. Hubbard. Mr. Pierce was found in a swamp, not wandering around in the woods. He was in a swamp. And that's where they found Mr. Pierce. He was in possession of the items that were left along the trail as well as the items that he had on his person as well as items that matched the description of the person who had been in the credit union. Not only did the trail lead Mr. Pierce to the swamp, but it led the officers back to his bedroom where they found machine gun parts that matched the machine gun recovered during the course of this investigation. They also found that Mr. Pierce had a plan for the exact robbery that identified the exact credit union that identified the roles that individuals would play and the items that were going to be taken including the use of weapons during the course of this robbery. This case, as Judge Holland observed, was close to perfect for the prosecution because there could be no possible doubt that Mr. Pierce was a person who was involved in this robbery. So bottom line, with respect to the gun, the government's position is that notwithstanding the representation of opposing counsel, that even if the defense lawyer, by their lights, had not committed the strategic error of re-questioning or asking the wrong question to the police officer, there were numerous other witnesses that placed the gun in his hand, his possession, and other ways for the jury to have reached the same conclusion. Absolutely. And in fact, the officer's testimony wasn't that he pointed Mr. Hubbard out as the shooter. The question put to him was that he was left with the impression that the driver had been the one shooting. And as clarified on direct as well as during the cross-examination, he didn't know how many people were in the van. And so when Mr. Butler asked him ultimately the question that he didn't know, he testified truthfully. He didn't know who it was because he didn't really see because he was following the car. So there may or may not have been a violation of the first element of Strickland, but certainly not the second. Absolutely. I think that Mr. Pierce fails in that regard. As to the other issues that Mr. Pierce has raised in his brief, we submit that all issues dealing with the motion to withdraw were directly dealt with on the first appeal, and Judge Holland correctly found that there was no actual conflict that required Mr. Butler to get other counsel to argue the motion, and that Mr. Pierce at the evidentiary hearing did not establish anything other than a dispute, a disagreement between Mr. Butler and Mr. Pierce about trial tactics. Of course, Mr. Pierce didn't testify at the evidentiary hearing, so all we were left with was Mr. Butler's recollection of the events. I would point out that on direct appeal he argued that the relationship between himself and Mr. Butler was antagonistic, lacking in trust, quarrelsome, and that there was a breakdown in communication. However, this Court previously rejected all those arguments, and those are the same arguments submitted on this appeal. As for the investigation, Mr. Pierce has submitted no evidence in this briefing, nor at the evidentiary hearing, or anywhere else, that Adam, the mysterious Adam, ever existed, or if he had been found, or could have been found, or what effect it would have been if anything further had been done. I would submit that Mr. Pierce faces the hurdle over which he cannot overcome, and that is ultimately the District Court reviewed every issue and concluded that because the evidence was so overwhelming that Mr. Pierce could not establish ineffective assistance at counsel, and therefore that was the reason why the District Court ultimately denied the petition. If there are no other questions, then I would submit it to you. Thank you, Mr. Cohen. Thank you, Your Honor. Parts found in a shared bedroom that can be linked to a rifle used do not establish Mr. Pierce as the shooter, nor does an officer seeing him carrying a weapon from one vehicle to another. That does also not establish him as being the shooter. We can play this take each piece of evidence apart piece by piece, but we've got to look at this from the totality of the evidence that was before the jury, and Mr. Collins just ticked off a substantial amount of evidence that all points to Mr. Pierce, and the question that I guess we have to resolve is in the face of that evidence, can we conclude that asking one question too many of the victim officer would have resulted in a different outcome? And Your Honor, I think it would have. If he hadn't asked that question and the jury had been left with the testimony of readers saying Hubbard shot at me, and let me point out, Your Honor, that it's not... Why couldn't the jury say, look, if somebody's firing a machine gun at you, you might be wrong in identifying who the shooter was, but we've got all the other evidence that Mr. Collins ticked off that sort of leads inevitably to Mr. Pierce, and the jury was considering that evidence as well, and what we would have to conclude to rule in your favor is all that other evidence is not outweighed by one question too many. Well, Your Honor, I would ask this Court to parse the evidence and look at what we evidence... The problem, I mean, I don't understand your analysis. I've got to look at the same record that the jury looked at, and in deciding prejudice, we have to conclude that but for that one question, there is a substantial likelihood that the Well, it certainly would have given him strong grounds to argue in closing argument that the jury should believe the officer who was actually shot at as opposed to an admitted co-conspirator who is doing everything he could to pin the blame on somebody else so that he wouldn't be charged with it as well. Your Honor, because it came up, I would like to briefly speak about the motion to be relieved and point out that we did not there were no ineffective assistance claims raised on direct appeal. We are arguing that Mr. Butler was ineffective in not raising, not bringing to the courts of attention the extent of the conflict or when the conflict began. That's where he was ineffective. What came out of the evidentiary hearing was that Mr. Pierce had been expressing his dissatisfaction and asking Butler, telling Butler to get off the case for months prior to the trial beginning. And that's what the Ninth Circuit was not aware of. That's what the District Court was not aware of when they ruled on that motion to substitute counsel. Had that court, either one of those courts, been aware that this had been going on for months, number one, it would have had a significant impact on the timeliness analysis of the motion to substitute. Number two, it would have gone to the extent of the conflict. What do we do with Judge Holland's observation, which I think is in writing, in his order denying behaviorist relief, that he didn't see any indication in all the contact that he had with your client that there was a problem between the lawyer and the client? It was the mother. Right. Well, Your Honor, I would in particular refer the court to the letter Mr. Pierce wrote and has filed under seal and was included in our excerpt of record where he states in there things like, I do not recognize my forced counsel. I've asked for investigation to be done. It's not being done. I'm being forced to go to trial with this attorney that I do not recognize. We'll take a look at it. Thank you. The case just argued is submitted.
judges: Tallman, Smith, Reavley